IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **CARRIER CORPORATION,** | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | |
| **DAVID W. HOLMES, JEREMY D.** | § | A-24-CV-187-DII |
| **BATES, AND WAY SERVICE, LTD.,** | § | |
| Defendants. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Before the court are Plaintiff's Motion for Preliminary Injunction (Dkt. 37), Defendant David W. Holmes' Motion to Strike Declaration Supporting Plaintiff's Motion for Preliminary Injunction (Dkt. 42), and all related briefing.[1] *See* Dkts. 40, 41, 46, 47, 50. On September 10, 2024, the court conducted a nearly all-day hearing on the matter at which attorneys for both parties ably represented their clients. Upon careful consideration of the pleadings, the relevant case law, as well as the arguments, testimony, and evidence presented to the court during the preliminary injunction hearing, the undersigned submits the following Report and Recommendation to the District Court.

---

[1] The motions were referred by United States District Judge Robert Pitman to the undersigned for a determination or a Report and Recommendation as to the merits, as appropriate, pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Text Orders Dated July 30, 2024.

1

I. **BACKGROUND**[2]

David Holmes began working for Carrier in 1986. Exh. X.[3] He worked for Carrier for over 38 years. *Id*. His final position with Carrier was as Service Sales Representative. *Id*. He notified Carrier of his resignation on January 5, 2024, and his last day with Carrier was January 12, 2024. Exh. C.

Before his retirement, Holmes's compensation from Carrier was outlined in a 2021 Bonus and Sales Incentive Plan ("SIP"), which he signed on March 9, 2023. Exh. B. The SIP provided for a salary plus bonus compensation structure. *Id*. The SIP also provided that

> during his/her employment with the Company and during the twelve-month period following the Participant's termination he/she will not: (1) solicit a Company employee, or individual who had been a Company employee during the three months preceding the Participant's termination for an opportunity outside of the Company, (2) solicit a Company customer or individual/business who had been a Company customer during the three months preceding the Participant's termination for the purpose of inducing such customer to cease doing business or reduce their business with the Company, or to purchase, lease or utilize products or services that are competitive with, similar to, or that may be used as substitutes for any products or services offered by the Company, (3) publicly disparage the Company, its employees, directors, products, or otherwise makes a public statement that is materially detrimental to the interest of the Company or such individuals, or (4) become employed by, consults for, or otherwise render service to any business entity or person engaged in activities that (i) competes with products or services offered by the Company of which the Participant had operational knowledge of or substantial exposure to during the twenty-four months preceding the Participant's termination, and that is located in a region in which the Participant had substantial responsibilities during the twenty-four months preceding the Participant's termination . . . .

*Id*. § 11.7. Uncontroverted evidence and testimony at the preliminary injunction hearing demonstrated that Holmes violated each of these four prohibitions. Through the SIP, Holmes also

---

[2] Any factual determinations are made for the limited purpose of the present motions only.
[3] Unless otherwise noted, exhibits refer to Plaintiff's exhibits submitted at the hearing. Defendants did not submit exhibits at the hearing.

acknowledged that Carrier would be entitled to preliminary and permanent injunctive relief if the prohibitions were violated. *Id*.

Holmes began interviewing with Way Service at least by October 24, 2023. Exh. D. On November 17, 2023, Holmes announced on a personal email chain that he would finish the year with Carrier, then go to the firm he had been interviewing with (Way Service). Exh. F. On November 27, 2023, Holmes reached out to a vendor he had previously used to purchase company-logo embroidered shirts inquiring about the process for purchasing shirts with a new company logo. Exh. G. Beginning November 28, 2023, until he left Carrier, Holmes began sending emails with Carrier documents as attachments from his Carrier email account to his personal email account. Exh. K. Those emails and attachments included a list of Carrier customers with hours worked per customer, Exh. K; a Service Agreement with related documents specific to one customer, Exh. N; a Carrier customer's Service Agreement with pricing amendments, Exh. P; the scope of work for a Carrier customer, Exh. Q; a Carrier customer's Renewal Letter, Exh. S; a Carrier customer's parts pricing email, Exh. T; a Carrier customer's Service Agreement and Service Agreement Equipment statement, Exh. U; another list of Carrier customers and their Service Agreement Scope of Work statements, Exh. L. On December 13, 2023, Holmes emailed a Carrier quote for a customer to the Way Service email of Jeremy Bates, a former Carrier technician. Exh. E. That same day, Holmes sent another Carrier's customer's Service Agreement to Bates's personal email address. Exh. O.

On January 3, 2024, Holmes signed his Offer Letter from Way Service, which he then emailed to his personal email address. Exh. H. The Offer Letter included a "No Conflicting Obligations" provision:

> You represent and warrant that your execution of this letter agreement, your employment with the Company [Way Service], and the performance of your duties

3

>for the Company will not violate any obligations you may have to any former employer (or other person or entity), including any obligations with respect to noncompetition or confidential information. You agree that you will not use for the benefit of, or disclose to, the Company any confidential information belonging to any former employer (or other person or entity) unless you have written permission from the prior employer or entity to do so (or unless the Company has been granted such permission).

*Id*.

When Holmes left Carrier on January 12, 2024, he filled out and signed an Exiting Employee Checklist in which he acknowledged that he had "returned and accounted for all material of any kind, containing company information, received or prepared by me in connection with my employment" and had "retained no copies, reproductions or excerpts of such material." Exh. W.

Holmes began working for Way Service in the third week of January 2024 as a Senior Account Manager in Austin. Exh. Y-1. At that time, he began emailing Carrier customers informing them of his new position with Way Service and encouraging them to reach out if there was anything he could do for them. *Id*; Exhs. Y-1a, Y-3a, Y-4a, Y-6, Y-7, Y-8, Y-9, Y-10, Y-11, Y-13, Y-14. In his emails, he described Way Service as "very well organized and structured." Exhs. Y-1, Y-4a (similar), Y-6 (similar), Y-7 (similar), Y-8 (similar), Y-9 (similar), Y-10 (similar), Y-11 (similar), Y-13 (similar), Y-14 (similar). He stated he left Carrier because he "just could not keep going on with the way management was running things and the woke corporate culture . . . . I had to go somewhere where I can properly serve my clients and have the proper support and structure required to do that!" Exh. Y-3a, Y-8 (similar), Y-9 (similar), Y-11 (similar). Several Carrier customers expressed interested in moving their business to Way Service. *See* Exhs. Y-2, Y-4, Y-7a, Y-8c, Y-13a.

On February 1, 2024, Holmes emailed Way Service's General Manager, Ryan Shaer, an "actual workup that [Holmes] did at Carrier" for a "long-term customer of [Holmes] while at

4

Carrier." Exhs. Z-1a, Z-3a. Also on February 1, 2024, Holmes emailed Shaer about a Carrier technician Holmes thought Way Service should recruit. Exh. Z. Holmes told Shaer, he "had been talking with Randy ever since I decided to leave Carrier because I knew he'd be a great asset here on our team." *Id*.

Carrier filed suit on February 23, 2024, against Holmes, Bates, and Way Service. Dkt. 1. Carrier alleged federal and state trade secret misappropriation claims, an unjust enrichment claim, and a restitution claim against all Defendants. *Id*. Against only Holmes, Carrier asserted claims for breach of duty to Carrier by the disclosure and/or use of Carrier's confidential information and breach of contract for violating the SIP's covenant not to compete and the non-solicitation provisions.[4] *Id*. The same day, Carrier also moved for a temporary restraining order prohibiting Holmes from working for Way Service and prohibiting Defendants from accessing, benefitting from, or using any of Carrier's trade secrets or confidential information. Dkt. 2. After a telephonic conference at which Carrier and Way Service each appeared through counsel and Holmes and Bates both appeared *pro se*, Dkt. 10, the court enjoined Defendants from using Carrier's confidential information. Dkt. 19.

After they learned of the lawsuit, Holmes, Bates, and Way Service agreed to isolate any Carrier information on their devices, turned over those devices for forensic examination, and removed any Carrier information from the devices. Shaer also testified that Way Service has intentionally not done business with any of Holmes's Carrier customers and has turned down opportunities to do business with those customers.

---

[4] After filing its motion for preliminary injunction, Carrier filed an Amended Complaint asserting an additional breach of contract claim for violating the non-solicitation provision by soliciting Carrier's employees to come work for Way Service. Dkt. 48.

Carrier now moves for a preliminary injunction enjoining Holmes from working for Way Service and enjoining all Defendants from accessing, distributing, benefitting from, or other use of any Carrier's trade secrets or confidential information. Dkt. 37. Carrier seeks its preliminary injunction against Holmes based on its breach of contract claim against him and against all Defendants based on its state and federal trade secrets claims. *Id*. Defendants oppose the motion as to Holmes's employment with Way Service but agree to the motion as to the use of Carrier's trade secrets and confidential information. Dkts. 40, 41. Accordingly, the only issue before the court is whether Carrier is entitled to enjoin Holmes from working for Way Service until January 12, 2025, the date his one-year noncompete would end.

## II.     LEGAL STANDARD

The grant of injunctive relief is an "extraordinary remedy" which requires the movant to unequivocally show the needs for its issuance. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012); *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). The Supreme Court has cautioned that temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974).

The movant for a preliminary injunction must show: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).

However, even when a movant established each of the four requirements described above, the decision whether to grant or deny a preliminary injunction remains within the court's discretion, and the decision to grant a preliminary injunction is treated as the exception rather than the rule. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

### III.   ANALYSIS

This court has subject matter jurisdiction in this case under 28 U.S.C. § 1332 because Carrier has asserted a federal-trade secrets claim. *See* Dkt. 1 ¶ 5. The court has supplemental jurisdiction over Carrier's state-law claims under 28 U.S.C. § 1367(a). Accordingly, the court turns to the four elements required for a preliminary injunction.

#### A. Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *TFC Partners, Inc. v. Stratton Amenities, LLC*, 2019 WL 369152, at *2 (W.D. Tex. Jan. 30, 2019); *see Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011). Carrier seeks a preliminary injunction based on its claim that Holmes breached the noncompete provision by working for Way Service. To succeed on its motion for a preliminary injunction, Carrier must show that there was an enforceable noncompete agreement and that it is substantially likely that Holmes violated that agreement. *Henson Patriot Co. v. Medina*, 2014 WL 4546973, at *2 (W.D. Tex. Sept. 11, 2014). Holmes argues that the noncompete provision is unenforceable because it is overly broad.

Under Texas law, a provision not to compete is enforceable if: (1) it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made; and (2) the limitations of time, geographical area, and scope of activity are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise. TEX.

BUS. & COM. CODE ANN. § 15.50.  As to a covenant's scope of activity, Texas courts have held that the scope of activity restrained must "bear some relation to the activities of the employee" on the former employer's behalf and should not "restrain [the employee's] activities in a territory into which his former work has not taken him or given him the opportunity to enjoy undue advantages in later competition with his employer." *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386-87 (Tex. 1991).

Holmes argues the non-compete provision's scope is overly broad because it prevents him from working for Way Service in any capacity, including in a capacity that would not compete with Carrier. *See* Dkt. 40 at 14 (citing *D'Onofrio v. Vacation Pubs., Inc.*, 888 F.3d 197, 211-12 (5th Cir. 2018); *Byun v. Hong*, 641 S.W.3d 821, 824-25 (Tex. App.—Tyler 2022, no pet.); *Forum US, Inc. v. Musselwhite*, 2020 WL 4331442 (Tex. App.—Houston [14th Dist.] July 28, 2020, no pet.) (mem. op.)). But those cases also hold that if the court determines a noncompete provision is too broad, it should narrow the language as it deems appropriate. *D'Onofrio*, 888 F.3d at 212; *Byun*, 641 S.W.3d at 828; *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 855–56 (W.D. Tex. 2016); TEX. BUS. & COM. CODE § 15.51(c).

Here, the noncompete is limited in time: for twelve months; and in geographic region: a region in which Holmes had substantial responsibilities during the twenty-four months preceding his termination. Exh. B. § 11.7. However, the noncompete states Holmes may not "become employed by, consult[] for, or otherwise render service to any business entity or person engaged in activities that (i) competes with products or services offered by [Carrier] of which the Participant had operational knowledge of or substantial exposure to." *Id*. Holmes argues this is too broad and would limit him from even being employed as a janitor at Way Service. Carrier argues that it does not interpret the noncompete that broadly.

8

Facially, the noncompete's scope is overly broad. However, Holmes testified that his role at Way Service is like his role at Carrier. Shaer testified that Way Service considered placing Holmes in another role after it learned of the lawsuit, but he was not qualified for any other role. Thus, as applied, the noncompete is not overly broad. Nonetheless, the court will reform the provision to state Holmes may not "become employed by, consult[] for, or otherwise render service <u>in a role that is similar in scope such that he is competing with Carrier</u> to any business entity or person engaged in activities. . . ."

With this change, the noncompete provision is enforceable and part of an enforceable contract when it was made. There is no dispute that Carrier and Way Service are competitors, and there is no dispute that Holmes's role at Way Service was intended to be the same role he had at Carrier. Carrier has shown it has a likelihood of success on its claim that Holmes breached his contract by violating the non-compete provision.

Similarly, the email evidence demonstrates that Holmes participated in recruiting a Carrier technician to join Way Service. The email evidence also demonstrates that Holmes reached out to Carrier customers to solicit their business. Carrier has shown it has a likelihood of success on all of its breach of contract claims.

### B. Irreparable Injury

To show threat of irreparable injury, a movant must demonstrate "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). The court looks not to the magnitude of the harm allegedly suffered, but the irreparability of it. *See Propath Servs., LLP v. Ameripath, Inc.*, 2004 WL 2389214, *6 (N.D. Tex. Oct. 21, 2004). If the movant could possibly be sufficiently compensated at a later date during the course of the case, that weighs

9

heavily against a conclusion that it suffered any irreparable harm. *See Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

Carrier cites cases stating that a breach of a noncompete agreement "gives rise to a rebuttable presumption" of irreparable injury and is "the epitome of irreparable injury." *See Electro-Motor, Inc. v. Indus. Apparatus Servs., Inc*., 390 B.R. 859, 870 (Bankr. E.D. Tex. 2008); *Sirius Comput. Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. Oct. 5, 2015). Carrier argues that based on Holmes's position as Carrier's sole sales representative in his region, his customer-facing role in commercial HVAC service sales, his access to Carrier sales plans, and his exposure to other trade secrets and confidential information within his business unit and other business units within Carrier's Commercial HVAC Division, Holmes is uniquely positioned to cause immediate and irreparable harm to Carrier through his work for Way Service, as he has all of the knowledge needed to undercut Carrier's competitive advantage in the Austin market. Dkt. 37 at 10.

Matthew Potilechio, Carrier's Central Zone Sales Leader, testified that Carrier lost seven customers from November 2023 until September 2024. However, Potilechio could not identify the customers that had left Carrier to go to Way Service. He also testified that Carrier has been fielding a lot of requests from customers and trying to retain as many customers as possible, but he did not know of any current Carrier customers who were at immediate risk of leaving Carrier. Potilechio valued the lost contracts at $130,000 per year. He also stated Carrier could not be compensated for only the lost customers because Carrier would hope to achieve additional revenues from those customers such as equipment repairs and the eventual replacement of outdated equipment.

Holmes testified that many of Carrier's customers had been upset for the last several years regarding the service they were being provided. Holmes also testified that some Carrier customers had told him they were leaving Carrier to follow Bates to Way Service.

Carrier has not shown that it has lost any customers to Way Service or because of Holmes' actions. Moreover, the harm that Potilechio testified to—lost revenue from future business with existing Carrier customers—is entirely financial. Finally, given the constraints Way Service has implemented since learning of the lawsuit and Holmes's obligations to Carrier, the threat of injury to Carrier is minimal.

### C. Balancing of Equities

"The third factor requires the plaintiff to establish that his irreparable harm is greater than the hardship that the preliminary injunction would cause the defendant." *DS Waters of Am., Inc. v. Princess Abita Water, LLC*, 539 F. Supp. 2d 853, 863 (E.D. La. 2008).

The court recognizes Carrier's fear of harm by Holmes's continued employment with Carrier. But so far, Carrier's harm is speculative. Holmes has been employed by Way Service since January 2024. Carrier did not file the instant motion until July—six months after Holmes started with Way Service and five months after Carrier filed suit. Yet, despite that elapsed time Carrier was unable to identify any clients that it lost to Way Service during the time of Holmes's employment with Way Service.

Holmes testified about his need for employment in the Austin area. And Shaer testified that Holmes was not qualified to work at any other position for Way Service.

The balance of equities do not weigh in favor of entirely disallowing Holmes from working for Way Service. The evidence has shown that conditions on Holmes' employment can be put in place to minimize the risk of harm to Carrier.

11

**D. Public Interest**

Finally, the fourth factor requires that granting the preliminary injunction will not disserve the public interest. *Hood*, 822 F.3d at 220. In this instance, the court finds that the public interest would not be served by a complete prohibition on Holmes working for Way Service.

**E. Conclusion**

Carrier has demonstrated that it will face some amount of risk if Holmes continues to work for Way Service. However, the restrictions Way Service has already placed on Holmes's employment have minimized that risk. Accordingly, the undersigned does not find that a complete prohibition on Holmes's employment with Way Service is warranted. Instead, Carrier can be protected through expanding Way Service's current protocols.[5] Accordingly, the undersigned will recommend that Defendants be enjoined until January 12, 2025, as follows:

1. Defendants David W. Holmes, Jeremy D. Bates, and Way Service, Ltd. be enjoined from accessing, distributing, benefitting from, or other use of any Carrier's trade secrets or confidential information;

2. Defendant David Holmes be enjoined from having any business contact with any Carrier customer or individual/business who had been a Carrier customer during the three months preceding Holmes's termination from Carrier; and

3. Defendant David Holmes be enjoined from having any business contact with any Carrier employee or individual who had been a Carrier employee during the three months preceding his termination for an opportunity outside of Carrier.

---

[5] The court's analysis has primarily focused on Carrier's breach of contract claim because the undersigned believes that is Carrier's strongest claim. Detailed consideration of Carrier's trade secrets claims would not alter the court's analysis on the appropriateness of a preliminary injunction.

### IV.     MOTION TO STRIKE

Holmes moved to strike Potilechio's declaration, which Carrier cited to in support of its motion for preliminary injunction. Dkt. 42. The court denies that motion. Potilechio testified at the hearing and was subject to cross examination as to anything he stated in his declaration.

### V.     ORDER AND RECOMMENDATIONS

For the reasons given above, the undersigned **DENIES** Defendant David W. Holmes' Motion to Strike Declaration Supporting Plaintiff's Motion for Preliminary Injunction (Dkt. 42).

The undersigned **RECOMMENDS** the District Court **GRANT in part** Plaintiff's Motion for Preliminary Injunction (Dkt. 37), Specifically, the undersigned **RECOMMENDS** the District Court that Defendants be enjoined until January 12, 2025, as follows:

1. Defendants David W. Holmes, Jeremy D. Bates, and Way Service, Ltd. be enjoined from accessing, distributing, benefitting from, or other use of any Carrier's trade secrets or confidential information;

2. Defendant David Holmes be enjoined from having any business contact with any Carrier customer or individual/business who had been a Carrier customer during the three months preceding Holmes's termination from Carrier; and

3. Defendant David Holmes be enjoined from having any business contact with any Carrier employee or individual who had been a Carrier employee during the three months preceding his termination for an opportunity outside of Carrier.

### VI.    OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are

being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).

SIGNED September 20, 2024.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE